# UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

WILLIAM BEAUMONT HOSPITAL and SOUTH
OAKLAND ANESTHESIA ASSOCIATES, P.C.,

      Plaintiffs,

v.                                    Case No. 09-CV-11941

MEDTRONIC, INC.,

      Defendant.
      _____/

### OPINION AND ORDER DENYING IN PART DEFENDANT'S "MOTION TO COMPEL PRODUCTION OF DOCUMENTS" AND DIRECTING PLAINTIFFS TO UPDATE THEIR PRIVILEGE LOG AND FILE ADDITIONAL DOCUMENTATION

Before the court is Defendant Medtronic, Inc.'s "Motion to Compel Production of Documents," filed on February 23, 2010. A hearing on this motion is unnecessary. *See* E.D. Mich. LR 7.1(e)(2). For the reasons stated below, the court will deny in part Defendant's motion.

### I. BACKGROUND

On April 15, 2005, an anesthesiologist from Defendant South Oakland Anesthesia Associates, P.C. ("SOAA") attempted to perform a procedure to refill Kathy Cober's Medtronic pain pump at Defendant William Beaumont Hospital ("Beaumont"). (Pls.' Am. Compl. ¶ 12.) The procedure required the use of a "refill kit;" however, a Beaumont nurse retrieved a "catheter access kit" instead. (*Id.* ¶¶ 11, 13.) As a result of the use of the "catheter access kit," the medication was delivered directly into Ms. Cober's intrathecal space causing an overdose ("Cober Incident"). (*Id.* ¶ 12.)

The family of Ms. Cober ("Cober Plaintiffs") sued Beaumont, SOAA, and others in Oakland County Circuit Court claiming damages arising out of the incident ("Cober Litigation"). (*Id.* ¶ 14.) Medtronic was made aware of the incident and the lawsuit and participated in discovery. (*Id.* ¶¶ 15, 17.) Counsel for Beaumont and SOAA invited Medtronic to participate in discussions to settle the Cober Litigation, but Medtronic refused. (*Id.* ¶ 22.) On May 29, 2008, Beaumont and SOAA settled the case with the Cober Plaintiffs. (*Id.* ¶ 23.) The settlement included a release of the Cober Plaintiffs' rights against Medtronic. (*Id.*)

On May 21, 2009, Plaintiffs initiated the present action seeking contribution from Medtronic for "Medtronic's allocable share of fault in causing the injury to Ms. Cober." (*Id.* ¶ 28.) Plaintiffs allege that approximately two to three weeks before the Cober Incident, a representative of Medtronic offered to provide free samples of "pain pump refill kits" for use in refilling Medtronic's implanted pain pumps. (*Id.* ¶ 8.) Medtronic then delivered three free samples to Beaumont. (*Id.*) Only two, however, were "refill kits," while one was a "catheter access kit." (*Id.* ¶ 10.) A representative of Medtronic, Provvidenza Cucchiara, later admitted that a "catheter access kit" should not have been delivered to the Beaumont Department of Anesthesia because "such kits were used primarily for diagnostic procedures, not for pain management." (*Id.* ¶ 13.) Plaintiffs allege that Medtronic was negligent in delivering a diagnostic kit to the anesthesiology department and also for stating that the kit could be used for refill procedures. (*Id.* ¶ 24.)

During discovery, Medtronic served Plaintiffs with requests for admissions, interrogatories, and document requests. (Def.'s Mot. at 8.) In response to certain

document requests, Plaintiffs "objected on the grounds of statutory privileges protecting peer review and other similar matters from disclosure." (*Id.*) On January 22, 2010, Plaintiffs produced a peer review privilege log comprising: (1) Variance Reports and accompanying investigative notes and communications, (2) a Sentinel Event Report and accompanying materials, (3) an Anestheisa Department Quality Assurance Review and accompanying materials, (4) a Summary FDA Site Visit, (5) a Beaumont Services Company Report of a Variance Report and accompanying investigative notes and communications, and (6) Physician Credential Files. (*Id.*, Ex. B.) On February 23, 2010, Defendant filed a motion to compel the documents withheld by Plaintiffs on the basis of a peer review privilege.

Defendant argues that the peer review privilege does not apply to the documents withheld by Plaintiffs, and even if it did, Plaintiffs have waived the privilege by placing the Cober Incident at issue in this litigation and by involving Defendant in the peer review process. Plaintiffs argue that the withheld documents are privileged because they are "inextricably linked" to the peer review process and that their contribution claim does not waive their right to assert the peer review privilege.

## II. STANDARD

### A. Peer Review Privilege

Under the Rules of Civil Procedure, a party "may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1). The Federal Rules of Evidence govern the discoverability of privileged materials. Fed. R. Evid. 1101; Fed. R. Civ. P 26(b). Pursuant to Federal Rule of Evidence 501, the state law of privileges applies to evidence relevant to establishing an

3

element of any claim or defense based in state law.  Fed. R. Evid. 501.  The present case is a contribution action under Michigan law.  Accordingly, Michigan law governs the determination of a privilege.

Michigan's Public Health Code requires hospitals "to review their professional practices and procedures to improve the quality of patient care and reduce morbidity and mortality."  *Gallagher v. Detroit-Macomb Hosp. Ass'n*, 431 N.W.2d 90, 94 (Mich. Ct. App. 1988).  To facilitate this review, hospitals must establish peer review committees.  *Dorris v. Detroit Osteopathic Hosp. Corp.*, 594 N.W.2d 455, 463 (Mich. 1999).  Specifically, hospitals must:

> assure that physicians and dentists admitted to practice in the hospital are organized into a medical staff to enable an effective review of the professional practices in the hospital for the purpose of reducing morbidity and mortality and improving the care provided in the hospital for patients.  The review shall include the quality and necessity of the care provided and the preventability of complications and deaths occurring in the hospital.

Mich. Comp. Laws § 333.21513(d).

To maximize the effectiveness of this review, Michigan has enacted two statutes that create a peer review privilege for records collected at the direction of a peer review committee.  Under Mich. Comp. Laws § 333.20175(8),

> [t]he records, data, and knowledge collected for or by individuals or committees assigned a professional review function in a health facility or agency, or an institution of higher education in this state that has colleges of osteopathic and human medicine, are confidential, shall be used only for the purposes provided in this article, are not public records, and are not subject to court subpoena.

Mich. Comp. Laws § 333.20175(8).  Similarly, Mich. Comp. Laws § 333.21515 provides that "[t]he records, data, and knowledge collected for or by individuals or committees assigned a review function described in this article are confidential and shall be used

4

only for the purposes provided in this article, shall not be public records, and shall not be available for court subpoena." Mich. Comp. Laws § 333.21515.

To determine whether a record is privileged, "the court should consider the hospital's bylaws, internal rules and regulations and whether the committee's function is that of retrospective review for purposes of improvement and self-analysis and thereby protected, or part of current patient care." *Gallagher*, 431 N.W.2d at 94. However, the records must have been collected for or by the peer review committee. *Marchand v. Henry Ford Hosp.*, 247 N.W.2d 280, 282 (Mich. 1976). The fact that information is submitted to a peer review committee does not mean that it satisfies the collection requirement so as to make it privileged. *Monty v. Warren Hosp. Corp.*, 366 N.W.2d 198, 202 (Mich. 1985). Also, the protection afforded quality assurance and peer review reports does not depend on the type of claim asserted by the proponent of the subpoena. *Ligouri v. Wyandotte Hosp. & Med. Ctr.*, 655 N.W.2d 592, 595 (Mich. Ct. App. 2003).

Although privileges are to be narrowly construed, *Centennial Healthcare Mgmt. Corp. v. Mich. Dep't of Consumer & Indus. Servs.*, 657 N.W.2d 746, 754 (Mich. Ct. App. 2003), the "Legislature protected peer review documents in broad terms." *In re Lieberman*, 646 N.W.2d 199, 202-03 (Mich. Ct. App. 2002) (stating that the peer review privilege statute "demonstrates that the Legislature has imposed a comprehensive ban on the disclosure" of peer review material). Indeed, peer review documents

> are not subject to disclosure in a criminal investigation pursuant to a search warrant, *In re Investigation of Lieberman*, 250 Mich. App. 381, 646 N.W.2d 199 (2002), a civil suit concerning an assault on a hospital patient, *Dorris, supra*, a medical malpractice claim, *Gallagher v. Detroit-Macomb Hosp. Ass'n*, 171 Mich. App. 761, 431 N.W.2d 90 (1988), or an

5

investigation by the Board of Medicine, *Attorney General v. Bruce*, 422 Mich. 157, 369 N.W.2d 826 (1985).

*Manzo v. Petrella*, 683 N.W.2d 699, 705 (Mich. Ct. App. 2004). The Michigan Legislature intended to "*fully* protect quality assurance/peer review records from discovery." *Ligouri*, 655 N.W.2d at 594 (emphasis in original).

The rationale for this strong protection of peer review material is that:

"[c]onfidentiality is essential to effective functioning of these staff meetings; and these meetings are essential to the continued improvement in the care and treatment of patients. Candid and conscientious evaluation of clinical practices is a *sine qua non* of adequate hospital care. To subject the discussions and deliberations to the discovery process, without a showing of exceptional necessity, would result in terminating such deliberations."

*Attorney General v. Bruce*, 369 N.W.2d 826 (Mich. 1985) (quoting *Bredice v. Doctors Hosp., Inc.*, 50 F.R.D. 249, 250 (D.D.C. 1970)). Without confidentiality, "the willingness of hospital staff to provide their candid assessment will be greatly diminished," which "will have a direct effect on the hospital's ability to monitor, investigate, and respond to trends and incidents that affect patient care, morbidity, and mortality." *Dorris*, 594 N.W.2d at 463. "By insuring that the proceedings remain confidential, the Legislature has provided strong incentive for hospitals to carry out their statutory duties in a meaningful fashion." *Attorney General v. Bruce*, 335 N.W.2d 697, 702 (Mich. Ct. App. 1983).

### III. DISCUSSION

#### A. Variance Reports and Sentinel Event Report

Plaintiffs assert that Variance Report #232655, a Beaumont Services Company Report of Variance Report #232655, and Variance Report #332782, as well as

6

associated investigative notes and communications are protected by the peer review privilege. (Pls.' Privilege Log, Def.'s Mot., Ex. B.) The two variance reports were prepared by staff nurses on April 15, 2005, and were given to Nursing Administration, Anesthesia Process Owner, and Medical Quality Program Management. (*Id.*) The Beaumont Services Company Report of Variance Report #2322655 was issued on November 3, 2005, by Beaumont Services Company and the Clinical Engineering Manager and staff. It was provided to the Patient Safety Officer, the Director of Medical Quality Program Management, the Director of Anesthesia Quality Assurance, and others. (*Id.*) Plaintiffs also assert that the root cause analysis, progress reports, notes, minutes, memos, and communications concerning Sentinel Event 05-03 are protected by the peer review privilege. (*Id.*)

Plaintiffs have attached policies from a Management Manual prepared by Beaumont's Medical Quality Program Management and Quality Management describing the process for preparation and review of Variance Reports.[1] (Pls.' Resp., Ex. B.) Policy Number 153 defines a Variance as "any process/occurrence inconsistent with the routine operation of the hospital or the routine care of patients" and states that "Variances shall be reported, analyzed, trended, and utilized through Intensive Assessment or other review processes to continually improve systems, processes, education and training to reduce/avoid their occurrence." (*Id.*)

---

[1] Defendant notes that "Plaintiffs have not submitted any sworn witness affidavit or testimony to support their assertion of privilege." (Def.'s Reply at 2.) Because the court is to consider "the hospital's bylaws, internal rules and regulations," the Management Manual provides a sufficient basis for the court to determine the existence of the peer review privilege with respect to the Variance Reports and Sentinel Event Reports. *Gallagher*, 431 N.W.2d at 94.

Pursuant to Policy Number 153-1, the first person (including a nurse) who discovers a Variance is required to initiate a Variance Report. (*Id.*) The Report is then given to the department manager or supervisor of the department, who is required to review the Variance Report for completeness and accuracy based on the impact on the patient's care/outcome and actions taken regarding correction and prevention. (*Id.*) The Report is then sent to Management Quality Program Management or Quality Management and the Process Owner. (*Id.*) The Process Owner documents additional findings and follow-up actions, inputs the information into a database, and determines the extent of necessary review. (*Id.*) The necessary review may entail Sentinel Event review (discussed *infra*), organizational review, departmental review, track and trend only, or Intensive Assessment, defined as "a complete, thorough, in-depth analysis which focuses primarily on processes and systems to discover causal factors leading up to a Variance and to develop and implement risk reduction action plans to prevent recurrences of the Variance." (*Id.*) The Process Owner is directed to "[a]nalyze, track and trend, and make process improvement recommendations on a on-going basis." (*Id.*) The Medical Quality Program Management and Quality Management receive all of the Variance Reports, collect aggregate data, and distribute quarterly reports to the hospital administration as appropriate. (*Id.*)

Regarding Confidentiality, Policy Statement 153 provides that "[a]ny records, data, and information collected for or by individuals involved with a Variance and the subsequent review and analysis are part of a professional, peer review function, performance improvement effort or other quality initiative and are confidential and protected from discovery." (*Id.*) Similarly, at the bottom of the Variance Report, it

8

states, "This report is CONFIDENTIAL and protected from discovery . . . . Its primary use is for professional review purposes in the interest of reducing morbidity and mortality, and improving the care provided patients." (*Id.*, Ex. C.)

A Variance that involves "death or serious physical or psychological injury" is deemed a Sentinel Event. (*Id.*, Ex. D.) For all Sentinel Events, a root cause analysis must be performed, pursuant to Policy Number 174. (*Id.*) The root cause analysis "is a process for identifying the basic reason or causal factor(s) for the Variance, which, if eliminated or corrected, would have prevented the Sentinel Event from occurring." (*Id.*) The analysis is performed by a task force, consisting of "the organization's leadership and appropriate individuals involved in the processes and systems under review." (*Id.*) Policy Number 174 states that "[a]ny records, data, and information collected for or by individuals involved with a Sentinel Event and the subsequent review and analysis are part of a professional, peer review function, performance improvement effort or other quality initiative and are confidential and protected from discovery." (*Id.*)

Michigan courts have addressed the applicability of the peer review privilege to "incident reports" or "occurrence reports" similar to the reports at issue in this case. *See, e.g.*, *Lindsey v. St. John Health System, Inc.*, Nos. 268296, 270042, 2007 WL 397075 (Mich. Ct. App. Feb. 6, 2007) (upholding the trial court's denial of plaintiff's motion to compel production of an "occurrence report" because it "necessarily related to a document that concerned the review of professional practices and the quality of care provided by the hospital"). For instance, in *Gregory v. Heritage Hospital* (a companion case to *Dorris*), a patient alleged that she was assaulted while staying at a hospital. *Dorris*, 594 N.W.2d at 458. The trial court ordered the hospital to produce an incident

9

report, "any investigative reports relative to the incident report," and "any notes, memoranda, records, and reports related to the incident." *Id.* at 458-59. The Michigan Supreme Court held that this was error because the hospital offered an affidavit stating that the information "was collected for the purpose of retrospective peer review by the peer review committee." *Id.* at 463-64. The court then remanded the case to the trial court to allow the plaintiff "to test the veracity of the hospital's procedures," i.e. whether the information "was actually collected for the purpose of retrospective review by the peer committee." *Id.*

The *Gregory* court relied on the Michigan Court of Appeals' decision in *Gallagher*, in which the Michigan Court of Appeals affirmed the trial court's decision to not admit a hospital incident report at trial. 431 N.W.2d at 94. The court determined that the hospital incident report was prepared for purposes consistent with Mich. Comp. Laws § 333.20175(5) and Mich. Comp. Laws § 333.21515 based on a hospital employee's testimony concerning the hospital's practices regarding incident reports. *Id.* The employee testified that the hospital incident reports were "completed for all unusual occurrences at the hospital" and that their purpose "was to assist the hospital in monitoring its own activities to reduce accidents, injuries, morbidity and mortality at the hospital." *Id.* The report was routed to the unit supervisor, department head, legal affairs department, and then to the hospital's Safety Committee or Quality Assurance Committee. *Id.* These committees were "assigned the responsibility of identifying trends or problems at the hospital," and the court found that "the quality and safety committees appear to fulfill the protected review functions." *Id.*

In this case, Plaintiffs have demonstrated that the Variance Reports, Sentinel Event Report, and accompanying materials are "records, data, and knowledge collected for or by individuals or committees assigned a professional review function in a health facility or agency." Mich. Comp. Laws § 333.20175(8). The primary use of the Reports was for "professional review purposes in the interest of reducing morbidity and mortality, and improving the care provided patients." (Pls.' Resp., Ex. C.) Similar to the report in *Gallagher* which was "completed for all unusual occurrences at the hospital," a Variance Report is completed for occurrences that are "inconsistent with the routine operation of the hospital or the routine care of patients." (*Id.*, Ex. B.) Like the report in *Gallagher* that was routed to various levels of hospital management, the Variance Report is sent to the department supervisor, Management Quality Program or Quality Management and the Process Owner. (*Id.*) Similar to the *Gallagher* committee that was "assigned the responsibility of identifying trends or problems at the hospital," the Process Owner is directed to "[a]nalyze, track and trend, and make process improvement recommendations on a on-going basis." (*Id.*) In addition, for all Sentinel Events, a task force is formed to conduct a root cause analysis to identify the cause of the Variance, which if corrected would have prevented it from occurring. (*Id.*, Ex. D.) These procedures demonstrate that the data and reports were collected for a professional review committee.[2] The purpose of this review was to reduce morbidity and mortality

---

[2]Defendant argues that the reports were created pursuant to the Safe Medical Devices Act and not for peer review purposes. (Def.'s Reply at 2.) Policy Number 153-2 sets out Beaumont's policies regarding the preparation and processing of Variance Reports effected by the Safe Medical Devices Act. (Pls.' Resp., Ex. B.) It requires the creation of two reports: a Medical Device Adverse Event Report and an Annual Summary. (*Id.*) These documents would arguably not be protected by the peer review

and improve patient care, consistent with the statutory directives of the State of Michigan. See Mich. Comp. Laws § 333.21513(d). Accordingly, these materials are protected from discovery by the peer review privilege.

### B. Anesthesia Department Quality Assurance Review, Summary FDA Site Visit, Physician Credential Files

Plaintiffs assert that documents entitled "Summary FDA site visit," "Anesthesia Department Quality Assurance Review," and "Physician Credential Files" are protected by the peer review privilege. (Pls.' Privilege Log, Def.'s Mot., Ex. B.) Unlike the Variance Reports and Sentinel Event Report, Plaintiffs have not provided any documentation showing why these documents were prepared and whether they were collected for or by a peer review committee. Nor do Plaintiffs provide any argument in their brief regarding these documents. With the exception of the Summary FDA Site Visit document, the other documents appear, at least nominally, to be privileged. See *Dye v. St. John Hosp. & Medical Center*, 584 N.W.2d 747, 749-51 (Mich. Ct. App. 1998) (rejecting "plaintiff's conclusion that materials relating to the provision of staff privileges are outside the purview of the statutes" and holding that the "confidentiality provisions of the statutes apply"). The court will therefore direct Plaintiffs to file documentation sufficient for the court to determine whether these documents are protected by the peer review privilege.

### C. The Privilege Log

---

privilege. However, there is no evidence that they were withheld by Plaintiffs on the basis of the peer review privilege as they are not included on their peer review privilege log.

Defendant argues that the claim of privilege must be rejected because Plaintiffs have failed to provide an adequate privilege log. (Def.'s Mot. Br. at 18.)  Under Federal Rule of Civil Procedure 26(b)(5), when parties assert a privilege, they must describe the nature of the withheld documents in a manner that permits the other parties to assess the validity of the privilege claim.  Fed. R. Civ. P. 26(b)(5).  In addition, this court's standing order regarding discovery practices and expectations states that "[d]ocuments withheld on the basis of privilege must be listed on a privilege log with sufficient information to enable the requesting party to understand the nature of the documents and the basis of the privilege claim."  The court concludes that Plaintiffs' privilege log sufficiently meets these standards.  It would not be practicable for a privilege log to contain a detailed description of the hospital's rules, regulations, and policies concerning peer review records.  Nonetheless, when a claim of privilege is challenged, as in this case, the party withholding the records must come forward with sufficient evidence to enable the court to conclusively determine that the privilege applies. Plaintiffs have provided sufficient evidence regarding the Variance Reports and Sentinel Event Report but have not done so with respect to the other documents.

The court has identified one deficiency in the privilege log.  Plaintiffs have not identified the names of the authors of the documents.  Information concerning the date and author of peer review documents is not protected by the peer review privilege.[3] *See Monty*, 366 N.W.2d at 201.  Plaintiffs will therefore be directed to supplement their

---

[3]Thus, it was improper for Plaintiffs' counsel to direct Dr. Michael Sikorsky at his deposition to not answer the question about the names of the persons involved in the quality-assurance process.  (Def.'s Reply, Ex. A.)

13

peer review privilege log with this information and provide an updated version of their peer review privilege log to Defendant.

### D. Waiver

According to Defendant, the "central issue" in its motion to compel is its claim that Plaintiffs have waived the peer review privilege. (Def.'s Reply at 3.) Defendant argues that Plaintiffs waived the peer review privilege by affirmatively bringing a contribution action and by involving Defendant in the peer review process. (Def.'s Mot. Br. at 11-18.) Plaintiffs argue that Beaumont has not waived the peer review privilege and that Defendant "fails to cite any Michigan case law in support of its argument that a claim for contribution somehow puts protected peer review material 'at issue' such that one could find a waiver of the peer review privilege." (Pls.' Resp. at 8.)

Whether the peer review privilege can be waived is a matter of first impression in Michigan. In some states, there is a statutory provision for waiver of the peer review privilege. *See* Susan O. Scheutzow & Sylvia Lynn Gillis, *Confidentiality and Privilege of Peer Review Information: More Imagined Than Real*, 7 J.L & Health 169, 190-92 (1993) (noting that "[m]ost of the states that provide a privilege for peer review information do not provide any way in which the privilege may be waived," but that six states do have a statutory waiver provision). In states without a statutory waiver provision, courts are split on whether the peer review privilege can be waived. *Compare Ayash v. Dana-Farber Cancer Inst.*, 822 N.E.2d 667, 692 n.28 (Mass. 2005) ("In our view, applying waiver principles to peer review communications would significantly undermine the effectiveness of the statute."), *and Emory Clinic v. Houston Emory Univ.*, 369 S.E.2d 913 (Ga. 1988) ("[T]he General Assembly has placed an absolute embargo upon the

14

discovery and use of all proceedings, records, findings and recommendations of peer review groups and medical review committees in civil litigation."), *with In re Missouri ex rel. St. John's Reg'l Med. Ctr. v. Dally*, 90 S.W.3d 209, 217 (Mo. Ct. App. 2002) (per curiam) ("[D]espite the public and other interests that underlie the peer review privilege, it is not an absolute privilege and can be waived . . . .").

A strong argument can be made that the peer review privilege is not waivable in Michigan. The statute specifically lists permissible reasons for the release of peer review material, but use in private civil litigation is not one of them. *See* Mich. Comp. Laws § 331.532 (allowing release of peer review material to, among other things, advance health care research and education, maintain health care profession standards, and protect the financial integrity of governmentally funded programs); *In re Lieberman*, 646 N.W.2d at 202 ("Underscoring the high level of confidentiality attendant to peer review documents is the statutory admonishment that such information is to be *used only for the reasons set forth in the legislative article including that privilege.*" (emphasis in original)). Moreover, with respect to other statutorily-created privileges, like the physician-patient privilege, the Michigan Legislature explicitly included a waiver provision in the statute; however, no waiver provision was included in the peer review privilege statute. *See id.* § 600.2157 ("If the patient brings an action against any defendant to recover for any personal injuries, or for any malpractice, and the patient produces a [treating] physician as a witness . . ., the patient shall be considered to have waived the [physician-patient] privilege . . . ."). Nonetheless, the court need not decide whether the peer review privilege is absolute, because even if it could be waived, Plaintiffs have not waived it in this case.

15

In support of its argument that Plaintiffs waived the peer review privilege by bringing a contribution claim, Defendant relies on the test set forth in *Howe v. Detroit Free Press, Inc.*, 487 N.W.2d 374 (Mich. 1992). In *Howe*, the Michigan Supreme Court held that the plaintiffs, who brought a defamation claim, waived the statutory probation report privilege when the defendant's truth defense was seriously undermined without the report. 487 N.W.2d at 384. The *Howe* court adopted the First Circuit's balancing test, articulated in *Greater Newburyport Clamshell Alliance v. Pub. Serv. Co. of N.H.*, 838 F.2d 13 (1st Cir. 1988), which provides that:

> a court should begin its analysis with a presumption in favor of preserving the privilege. In a civil damages action, however, fairness requires that the privilege holder surrender the privilege to the extent that it will weaken, in a meaningful way, the defendant's ability to defend. That is, the privilege ends at the point where the defendant can show that the plaintiff's civil claim, and the probable defenses thereto, are enmeshed in important evidence that will be unavailable to the defendant if the privilege prevails. The burden on the defendant is proportional to the importance of the privilege. The court should develop the parameters of its discovery order by carefully weighing the interests involved, balancing the importance of the privilege asserted against the defending party's need for the information to construct its most effective defense.

*Howe*, 487 N.W.2d at 380 (quoting *Clamshell*, 838 F.2d at 20). The *Howe* court then quoted the First Circuit's guidelines:

> First, defendants should demonstrate that the material to be discovered is relevant to their case. This showing should include an articulation of how the material could assist the preparation of their defense in a meaningful way. . . . Secondly, defendants should demonstrate why it would be unreasonably difficult for them to obtain the information elsewhere or that redundant evidence will be helpful to their case. They do not have to prove that it is absolutely unavailable from other sources. Of course, the more the requested discovery would intrude into the privilege, the greater should be the showing of need and lack of reasonable alternative sources.

*Id.* at 382-83 (quoting *Clamshell*, 838 F.2d at 22).

Applying the *Howe* balancing test,[4] the court concludes that Defendant has not overcome the presumption in favor of preserving the privilege. Defendant has not demonstrated that its ability to defend will be meaningfully weakened or that it would be unreasonably difficult to obtain the evidence elsewhere. (*See* Pls.' Resp. at 4 ("Defendant Medtronic has been provided 100% of the medical records pertaining to the care and treatment of Ms. Cober; 100% of the discovery materials, depositions, etc. generated in the underlying Cober litigation; and 100% access to depose each and every person involved in the underlying incident.").) To the extent the peer review protected information is relevant, it is the facts concerning the Cober Incident contained in those reports that are relevant. The facts themselves are not privileged, even if they were gathered and evaluated by a peer review committee. Defendant is free to depose the persons involved in the incident to ascertain those facts. Indeed, a written record of Beaumont's investigation and assessment of the causes and factors leading to the Cober Incident may not even exist if it were not for the statutory directive for hospitals to review its practices and the concomitant protection afforded to this review. Defendant can mount a full defense without the peer review material—its defense does not hinge

---

[4] Plaintiffs question the applicability of the *Howe* test to this case, noting that the *Howe* court underscored the "special standing of truth as a defense in a defamation action" and that *Howe* involved the probation officer-probationer privilege, which the court stated "bears little or no relationship to its protective purpose." (Pls.' Resp. at 8-9 (quoting *Howe*, 487 N.W.2d at 384).) In its reply, Defendant points out that "Plaintiffs' own counsel has recognized in his treatise on Michigan civil practice, the *Howe* at issue waiver standard applies to other evidentiary privileges, not just the probation officer privilege." (Def.'s Reply at 3 (citing Corrigan, et al., Mich. Prac. Guides: Civil Proc. Before Trial § 6.49 (2006).) Even though *Howe* is not controlling on the issue of waiver in the context of the peer review privilege, the Michigan Supreme Court would likely apply the *Howe* test if it were to find that the peer review privilege could be waived by placing the material "at issue."

on Plaintiffs' investigation of the Cober Incident, and there is no evidence that Plaintiffs are using the peer review material as "a shield and a dagger at one and the same time." *Dally*, 90 S.W.3d at 217.

In addition, the policy reasons behind the peer review privilege support not finding a waiver. A hospital will be reluctant to make effective records of its internal investigations with the knowledge that its confidentiality could be easily waived and then used against it as evidence in a later civil action. A ready waiver could have a chilling effect on the "candid assessment" that is necessary for a hospital to effectively "monitor, investigate, and respond to trends and incidents that affect patient care, morbidity, and mortality." *Dorris*, 594 N.W.2d at 463. This could undermine the "strong incentive for hospitals to carry out their statutory duties in a meaningful fashion." *Bruce*, 335 N.W.2d at 702.

Michigan's strong protection of peer review material demonstrates the importance of this privilege. The Michigan Legislature "has imposed a *comprehensive ban* on the disclosure of any information collected by, or records of the proceedings of, committees assigned a professional review function in hospitals and health facilities." *In re Lieberman*, 646 N.W.2d at 202 (emphasis added). Indeed, the peer review privilege trumps a search warrant in a criminal investigation, *id.* at 203, and it trumps an investigative subpoena from the Michigan Board of Medicine, *Bruce*, 369 N.W.2d at 832. These cases militate against finding a ready waiver.

Moreover, a contribution action is not a typical affirmative claim brought by a plaintiff. As the Michigan Court of Appeals has explained, "The *sine qua non* of the contribution statute is that the defendant from whom contribution is sought is a

18

tortfeasor. The contribution act affords a defendant a procedure to gain contribution from a fellow tortfeasor. It does not establish liability in the first instance." *Zoll v. Brinkerhoff*, 427 N.W.2d 610, 612 (Mich. Ct. App. 1988). The theory is that the injured party could have sued both the plaintiff now seeking contribution and the defendant, and liability would have been apportioned between these two in the underlying suit brought by the injured party. Because only the plaintiff was sued, however, the plaintiff is now seeking this apportionment in a contribution action. In the underlying Cober Litigation, the peer review material would not have been discoverable and had Defendant been a party, it would have had to defend the suit without this material. It would be a strange result to require the disclosure of this material when Plaintiffs are now seeking the same apportionment that would have occurred in the Cober Litigation had Defendant been a party. Thus, the "at issue" waiver argument is particularly weak in the context of a contribution claim.

Defendant also argues that Plaintiffs waived the peer review privilege by involving Defendant in the peer review process. (Def.'s Mot. Br. at 17.) In support, Defendant has attached emails from Beaumont's Clinical Engineering Manager seeking to speak with Defendant's engineers about performing a "human factors analysis." (Def.'s Mot., Ex. D.) Defendant's legal counsel sought information from Beaumont regarding the proposed testing protocol, but Beaumont never provided the requested information. (Def.'s Mot. Br. at 17 n.6.) Defendant does not assert that it was involved in producing the Variance Reports or Sentinel Event Report. Defendant provides no authority for the proposition that potential involvement in one aspect of the peer review process necessarily means that a person has access to the complete peer review

process. Accordingly, the court concludes that Plaintiffs have not waived the peer review privilege.

## IV. CONCLUSION

IT IS ORDERED that Defendant's "Motion to Compel Production of Documents" [Dkt. # 24] is DENIED IN PART. It is denied as to the first, second, and fifth entries on Plaintiff's peer review privilege log, i.e. the Variance Reports, Sentinel Reports, and accompanying investigative materials.

Plaintiffs are DIRECTED to file by **April 29, 2010**, documentation sufficient for the court to determine whether the third, fourth, and sixth entries on their privilege log are protected by the peer review privilege. Failure to file additional information by this date will result in Defendant's motion being granted as to these documents.

Plaintiffs are FURTHER DIRECTED to supplement their peer review privilege log with the authors of the documents and provide the updated privilege log to Defendant by **April 29, 2010**.

       S/Robert H. Cleland
       ROBERT H. CLELAND
       UNITED STATES DISTRICT JUDGE

Dated: April 21, 2010

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, April 21, 2010, by electronic and/or ordinary mail.

       S/Lisa G. Wagner
       Case Manager and Deputy Clerk
       (313) 234-5522